939 A.2d 116

**ANDERSON HOUSE, LLC**

v.

**MAYOR AND CITY COUNCIL OF ROCKVILLE.**

**No. 40 Sept. Term, 2007.**

Court of Appeals of Maryland.

Jan. 8, 2008.

690

692

694

Patrick James Attridge (King & Attridge, Rockville), on brief, for appellant.

Sondra Harans Block (Paul T. Glasgow, Rockville), on brief, for appellee.

Argued Before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, JJ., and ALAN M. WILNER and DALE R. CATHELL, JJ. (Retired, specially assigned).

HARRELL, Judge.

We issued a writ of certiorari in the present case, while the appeal was pending before the Court of Special Appeals, to resolve legal challenges related to the City of Rockville's ("the City") 2005 rezoning of Anderson House, LLC's property (a former residence converted to office use). in consolidated cases 266338–V, *Petition of Anderson House, LLC for Judicial Review of the Decision of the Mayor and Council of Rockville in the case of Zoning Map Amendment 2004–00091,* and 270350–V, *Anderson House, LLC v. Mayor and City Council of Rockville.* The issues presented are fourfold. As a preliminary matter, we consider whether the Circuit Court was vested with jurisdiction to determine the validity of City Ordinances 7–03, creating by zoning ordinance text amendment the Commercial Transition zone (hereinafter the "C–T" zone), and 21–05, zoning the Anderson House property C–T in the course of a comprehensive zoning map amendment. Because we shall find that jurisdiction existed, we proceed to the question of whether the development standards of the C–T zone created in 2003, into which the City placed Anderson House's property in 2005, conforms to the principle of zoning uniformity under Maryland Code, Article 66B, § 4.02, and the "identicality requirement" contained in Rockville City Code, § 25–1. Finally, we must decide whether Anderson House met the heavy burden of showing that the C–T rezoning of its property, accomplished as part of a comprehensive zoning, exceeded Rockville's power to zone in the public interest according to Maryland Code, Article 66B, § 4.01(b)(1).

# I.

The structure on Anderson House's property, located at 39 West Montgomery Avenue in the Town Center area of the City of Rockville, began its existence as a private residence. Ultimately it was converted to a private office building, retaining its general appearance as a residence. The land area of the Anderson House property is 32,670 square feet, which makes it the largest tract zoned C–T in the City. The two-story structure improving the lot contains 3,600 square feet of floor area, with a "footprint" of approximately 1,800 square feet on the parcel.

Prior to the enactment of Ordinance 21–05, the Anderson House property was zoned "O–2," or "Transitional Office," a zone intended to provide a buffer between residential and commercial uses.[1] After revision of the text of Rockville's zoning ordinance by Ordinance 7–03 to create the C–T zone, enacted on 28 April 2003, the Anderson House property was rezoned C–T by Ordinance 21–05, enacted 17 October 2005. The C–T zone requires that structures retain a residential character in order to transition between commercial uses and residential uses.[2]

■ The creation of the C–T zone and the placement of Anderson House's Property in it purported to carry out the recommendations of the City's 2001 "Town Center Master

---

1. According to the Rockville City Code § 25–272 the purpose of the O–2 zone is:

 to provide office space for private, quasi-public and public uses, to stabilize residential neighborhoods near commercial and office uses by establishing a transition between such uses and nearby residential uses, and to promote the preservation of existing residential structures. To these ends, uses are limited to a low concentration of activity and a building scale characteristic of the adjoining residential zones.

2. According to the Rockville City Code § 25–272 the purpose of the C–T zone is:

 to provide the opportunity to convert existing one-family detached dwellings to offices. It is intended to provide a transition between higher density commercial uses and residential uses, primarily by retaining the residential character of existing structures and lots.

Plan" and the 2004 "City-wide Comprehensive Master Plan," respectively.[3] Each plan contained recommendations for changes to the zoning text and map for the orderly development of the City. To accomplish the legal mechanisms to make the recommended changes, the Mayor and Council declared initially a seven-month moratorium on development in non-residential zones adjoining residential zones in the City. As its initial implementation response, the Mayor and City Council of Rockville adopted the Commercial Compatibility Text Amendment through Ordinance 7–03.[4] As previously mentioned, among other things, Ordinance 7–03 created the C–T zone for potential application to properties containing dwellings converted to office use.

Specific provisions of the C–T zone address side and rear setback requirements, lot width requirements, minimum lot size, floor area, and building height, but in arguably nontraditional ways to some extent. Properties placed in the C–T zone already containing dwellings converted for office use must have side and rear yard setbacks and lot width restrictions comparable to a similarly sized lot for a dwelling zoned residential.[5] The minimum lot size for an office structure in the C–T zone is 5,000 square feet or the size of an existing lot

---

3. The City adopted these plans pursuant to Maryland Code, Article 66B, §§ 3.06–3.08. "Plans are long term and theoretical, and usually contain elements concerning transportation and public facilities, recommended zoning, and other land use recommendations and proposals." *Mayor & City Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 529, 814 A.2d 469, 477 (2002).

4. "[P]lans, which are the result of work done by planning commissions and adopted by ultimate zoning bodies, are advisory in nature and have no force of law absent statutes or local ordinances linking planning and zoning." *Rylyns*, 372 Md. at 530, 814 A.2d at 530.

5. Rockville City Code § 25–312 provides:
 In the C–1, C–2, O–1, O–2, C–T, I–1 and I–2 Zones, the side yard setback requirement for any lot having a side yard abutting a street shall be equal to the average of the actual setbacks of buildings fronting on such street within the same block and on the same side of such street as the lot, except that in the I–1 and I–2 Zones, such setbacks shall be not less than twenty-five (25) feet.

if greater than 5,000 square feet.[6] The height of an existing structure was to be the maximum height limit. Finally, the total floor area of a structure cannot exceed more than 50 percent of the building's existing condition as of 1 January 2003.[7]

The Mayor and Council soon put the new C–T zone to use. Comprehensive Map Amendment Application MAP2003–00087, filed on 9 May 2003 by the City, proposed rezoning 21 properties throughout the City, including the Anderson House's property, to the new C–T zone. Upon notice that the City proposed to rezone its property from O–2 to C–T, Anderson House perfervidly protested, concerned that the new zone would operate to deny resubdivision of its property and thus preclude additional development on the lot. The City acquiesced to a deferral of action concerning the Anderson House property, pending its consideration of the more localized Town Center Sectional Map Amendment (also a comprehensive zoning initiative), to be processed the following Fall. Thus, when the City adopted Ordinance 23–03 on 4 August 2003 approving the 2003 comprehensive map amendment, 20 properties were rezoned to C–T, but the Anderson House property was not.

On 7 October 2004, the Town Center Sectional Map Amendment was filed by the City, proposing anew that the Anderson House property be reclassified C–T, together with rezonings of many other properties. Anderson House countered that its property should be split-zoned so that the western portion of the property, which contained the existing house/office building be rezoned C–T, while the eastern portion remain zoned O–2.[8] At a 10 January 2005 hearing before the Mayor and

---

6. The Rockville City Code § 25–311 contains a large table containing the minimum lot size requirements for C–T zoned properties.

7. The height and floor area restrictions are contained in Rockville City Code § 25–315.

8. Such a split-zoning proposal was possible because zoning district boundaries within the City of Rockville need not follow property boundaries. *See, e.g.,* Rockville City Code § 25–274(4).

Council, the City's Chief of Long Range Planning testified that the Anderson House property:

> is somewhat of an anomaly in that it's very large compared to other properties in the CT zone and probably does allow for some additional development on the site.... We have been discussing a potential split zoning to allow for redevelopment on the undeveloped portion of the site.

And by "split zoning," I mean a portion that would remain in the O–2, and the property that contains the Anderson House would be rezoned to the CT zone. So the practical effect would be that still the scale of development on the property would be in keeping with residential neighborhood.

Additionally, the Rockville Planning Commission unanimously recommended that the property be split-zoned as requested by Anderson House. The Mayor and Council, however, rejected split-zoning. When adopted on 17 October 2005, the Town Center Sectional Map Amendment, embodied in Ordinance 21–05, rezoned the Anderson House property C–T in its entirety, while also rezoning approximately one hundred other properties in the Town Center area of the City.

Anderson House promptly filed in the Circuit Court for Montgomery County a petition for judicial review of the final action of an administrative agency (frequently mistakenly referred to as an administrative appeal) on 8 November 2005, pursuant to Maryland Code, Article 66B, § 4.08(f),[9] and Rockville City Code § 25–100.[10] The action, Case No. 266338–V,

---

**9.** This provision provides that a local legislative body "may allow an appeal to the circuit court of any matter arising under the planning and zoning laws of the local jurisdiction." Maryland Code, Article 66B, § 4.08(f)(1). These so-called "appeals" are actually original actions for judicial review. *Armstrong v. Mayor and City Council of Baltimore*, 169 Md.App. 655, 665, 906 A.2d 415, 421 (2006).

**10.** Rockville City Code, Chapter 25, Zoning and Planning, Article III, Amendments, § 25–100, provides:

Any person aggrieved by a decision of the Council on any application for an amendment to the zoning map or by any decision by the Council adopting or amending the Plan may appeal such decision to

entitled *Petition of Anderson House LLC for Judicial Review of the Decision of the Mayor and Re: Ordinance No. 21–05 in the Case of Zoning Map Amendment 2005–00091*, challenged the rezoning of the Anderson House property to the C–T zone and attacked the underlying development standards created for the C–T zone by Ordinance 7–03. The City responded by contesting Anderson House's right to challenge the zoning ordinance text amendment through the modality of judicial review.

Out of an abundance of caution, in light of the City's jurisdictional challenge to the text amendment aspect of the judicial review action, Anderson House filed, on 29 March 2006 in the Circuit Court, a Complaint for Declaratory Judgment and Injunctive Relief pursuant to Maryland Code, Courts and Judicial Procedure Article, §§ 3–403,[11] 3–406,[12] 3–409.[13] Anderson House claimed that the C–T zone regulations violated the uniformity requirement in Maryland Code, Article 66B, § 4.02(b).[14] This complaint was docketed as Case No. 270350–V, and captioned *Anderson House, LLC v. Mayor and Council*

the Circuit Court for the County in accordance with the Maryland Rules as set forth in Chapter 1100, Subtitle B.

11. Maryland Code, Courts and Judicial Proceedings Article, § 3–403, provides, in pertinent part, that the Circuit Court may "declare rights, status, and other legal relations [of the parties] whether or not further relief is or could be claimed."

12. Maryland Code, Courts and Judicial Proceedings Article, § 3–406, provides, in pertinent part, that any person whose "rights, status, or other legal relations" are affected by a municipal ordinance may have a determination of the validity thereof and "obtain a declaration of rights, status, or other legal relations under it."

13. Maryland Code, Courts and Judicial Proceedings Article, § 3–409, provides, in pertinent part, that the court may grant a declaratory judgment if it will dispose of the controversy giving rise to the proceeding.

14. Maryland Code, Article 66B, § 4.02(b), provides, in pertinent part, that a regulated government may "regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land," but must do so in a way that provides uniformity for each class or kind of development throughout each district.

*of Rockville.* The Circuit Court, at the request of Anderson House and with the consent of the City, consolidated the two proceedings under Case No. 266338–V on 30 March 2006. The records of the two cases were cross-adopted.

On 31 March 2006, Anderson House amended its Complaint for Declaratory Judgment and Injunctive relief. The Amended Complaint added an allegation that the minimum lot area, maximum building height, and floor area restrictions for the C–T zone violated an "identicality requirement," found in the generic definition of the word "zone" in Rockville City Code § 25–1, that all requirements for each property within a zone be identical for the zone in which they apply.[15] The Amended Complaint also contended that provisions of Ordinances 7–03, creating the C–T zone, and 21–05, rezoning the Anderson House property C–T, violated a requirement contained in Maryland Code, Article 66B, § 4.01.[16] Specifically, the pleading alleged that the Ordinances were arbitrary, capricious, and an invalid exercise of zoning authority and, thus, not rationally related to the general public interest. Anderson House sought an injunction permanently restraining and enjoining the enforcement, operation, and effect of the Ordinances.

The Circuit Court ruled on the consolidated cases on 29 December 2006 by Memorandum Opinion and Order, giving judgment for the City of Rockville. In its memorandum, the Circuit Court reviewed first whether it had jurisdiction to hear the cases. It held that it lacked jurisdiction to determine Anderson House's judicial review action concerning Ordinance 7–03, creating the C–T zone through text amendment. The court concluded, however, that it had jurisdiction in that action to consider Ordinance 21–05, which placed the Anderson

---

**15.** The definition at Rockville City Code, § 25–1 reads:

*Zone* means an area within which certain uses of land and buildings are permitted and certain others are permitted only by special exception or are prohibited; yards and other open spaces are required; lot areas, building height limits, and other requirements are established; all of the foregoing being identical for the zone in which they apply.

**16.** Section 4.01(b)(1) requires that zoning regulations must promote the health, safety, morals, or general welfare of the community.

House property into the C–T zone. The court rejected all of Anderson House's challenges to Ordinance 21–05. Without further comment as to jurisdiction, it also rejected Anderson House's challenges to the various development regulations of the C–T zone.

Anderson House filed a timely Notice of Appeal to the Court of Special Appeals on 8 January 2007. Before that court could decide the appeal, this Court exercised its discretion to issue a writ of certiorari to consider the appeal.

## II

Jurisdiction existed for the Circuit Court to hear and decide the issues raised in the consolidated cases. Although the Circuit Court had some reservations as to how it should view or parse jurisdiction, we note that Anderson House assuredly properly invoked it by filing the two actions that were consolidated. *See Armstrong v. Mayor and City Council of Baltimore,* 169 Md.App. 655, 678, 906 A.2d 415, 428 (2006) ("When uncertain, practitioners sometimes file two actions, one seeking statutory review and the other seeking non-statutory review, because if they file one action and are wrong, a court may not treat the action as if it had asserted the proper basis for review."). The Circuit Court determined that it lacked jurisdiction to consider Anderson House's contentions as to Ordinance 7–03 in the judicial review action, but that it possessed jurisdiction to review Ordinance 21–05 in that case. The court, however, failed to articulate explicitly its views as to its jurisdictional basis to review the challenges to Ordinance 7–03, pursuant to Anderson House's Complaint for Declaratory Judgment, but decided those issues nonetheless in disposing of the consolidated cases.

The Declaratory Judgment Act, found in Maryland Code, Courts and Judicial Proceedings Article, §§ 3–403, 3–406, and 3–409, provides jurisdiction for a Circuit Court to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." Maryland Code, Courts and Judicial Proceedings Article, § 3–403. Section 3–406 provides

the Circuit Court with jurisdiction to determine the validity of municipal ordinances for persons whose legal relations are affected thereby and to provide such persons with a "declaration of rights, status, or other legal relations under it." Finally, § 3–409 provides the court with the power to grant a declaratory judgment. This power is constrained, however, by § 3–409(b), which cautions that "[i]f a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed in lieu of a proceeding under this subtitle."

Regarding "General Land Use Regulations and Zoning," a special form of remedy in some cases is provided by Maryland Code, Article 66B, § 4.08, "Appeals to Courts." Section 4.08(a) provides for judicial review of a "zoning action" by a circuit court of the county. Additionally, § 4.08(f) provides that "[i]n addition to the appeal provided in this section, a local legislative body may allow an appeal to the circuit court of any matter arising under the planning and zoning laws of the local jurisdiction." We held in *Josephson v. City of Annapolis*, 353 Md. 667, 728 A.2d 690 (1998), that § 4.08(a) provides a special administrative remedy in accordance with Title 7, Chapter 200 the Maryland Rules. Thus, the general rule is that if review is available under the special statutory remedy of § 4.08(a), no declaratory judgment action is available. *Josephson*, 353 Md. at 681, 728 A.2d at 696 ("[T]he general rule, which applies in this case, remains that when administrative remedies exist in zoning cases, they must be exhausted before other actions, including requests for declaratory judgments, mandamus and injunctive relief, may be brought."); *see also Prince George's County v. Ray's Used Cars*, 398 Md. 632, 922 A.2d 495 (2007) (finding that administrative remedies must be exhausted even where the constitutional issue exception is invoked if the administrative agency could provide relief on nonconstitutional grounds). Although we have not discussed this jurisdictional issue in the context of § 4.08(f), the same logic applies. "[W]here a statute provides a specific form of remedy in a specific case then this remedy must be followed." *Gingell v. Board of County Comm'rs*, 249

Md. 374, 377, 239 A.2d 903, 905 (1968). Thus, if a local jurisdiction invokes the power bestowed upon it by § 4.08(f) to recognize an action for judicial review beyond that embraced within § 4.08(a), such an action would be pre-eminent to any remedy a plaintiff might seek under the Declaratory Judgment Act.

■ Ordinance 7–03, creating the C–T zone, was a zoning ordinance text amendment. As stated earlier, the universe of possible jurisdictional predicates argued for the Circuit Court to consider Anderson House's challenges were Maryland Code, Article 66B, § 4.08(a) or (f) or the Declaratory Judgment Act. With regard to § 4.08(a), we held in *Md. Overpak Corp. v. Mayor & City Council of Baltimore*, 395 Md. 16, 32, 909 A.2d 235, 244 (2006) that "an act constituting a 'zoning action' for those jurisdictions governed by Article 66B is subject to judicial review" under that Section. Our analysis made explicit, however, that "amendments to the text of zoning regulations, comprehensive zonings, and other acts that are legislative in nature do not qualify for judicial review" as a "zoning action." *Id.* at 50, 909 A.2d at 255.

■ With regard to § 4.08(f), whereby the Legislature granted local legislative bodies the power to allow an "appeal" "of any matter arising under the planning and zoning laws of the local jurisdiction," the City of Rockville did not employ this power to grant to the Circuit Court for Montgomery County jurisdiction to review legal challenges to the adoption of text amendments via judicial review actions. In Article III, Amendments, of Chapter 25, Zoning and Planning, of the Rockville City Code, the City set out its regulations concerning map amendments and text amendments and also § 25–100, concerning "appeals." Section 25–100 provides that "[a]ny person aggrieved by a decision of the Council on any application for an amendment to the zoning map or by any decision by the Council adopting or amending the Plan may appeal such decision to the Circuit Court for the County in accordance with the Maryland Rules...." Both Anderson House and the City agree that this Section of the Rockville City Code

does not provide a litigant with a right to seek judicial review of an action adopting a zoning ordinance text amendment. Thus, no "special form of remedy" for judicial review of Ordinance 7–03 exists.

Anderson House's claims regarding Ordinance 7–03 satisfy the requirements of the Declaratory Judgment Act. Anderson House alleges that the City overstepped the powers conferred upon it by failing, in its enactment of the C–T zone, to conform to the uniformity requirement found in Maryland Code, Article 66B, § 4.02(b)(2). Whether that allegation has merit, as a matter of law, Anderson House is entitled to have the Circuit Court consider its claims as to Ordinance 7–03 because the C–T zone created by that legislation was applied to the Anderson House property through Ordinance 21–05. Thus, its rights were affected and the Circuit Court had jurisdiction to review the challenge to its enactment. *See Heery Int'l, Inc. v. Montgomery County*, 384 Md. 129, 149–50, 862 A.2d 976, 988 (2004) (citing *Perdue Farms, Inc. v. NLRB*, 108 F.3d 519, 521 (4th Cir.1997)) (finding a court "has jurisdiction to review decisions ... where the agency exceeds its delegated powers or ignores a statutory mandate, and the absence of judicial review would sacrifice or obliterate a right created by the legislature" (internal citations omitted)); *Prince George's County v. Md.-Nat'l Capital Park & Planning Comm'n*, 269 Md. 202, 209–10, 306 A.2d 223, 227–28 (1973) (finding a declaratory judgment action was the proper vehicle to determine whether the County Charter exceeded the power granted under the Maryland Code and that a declaration would terminate any uncertainty caused by "assertion of the Council's rights or privileges"); *see also Rylyns*, 372 Md. at 536, 814 A.2d at 481(referring to the uniformity requirement found in Maryland Code, Article 66B, § 4.02(b)(2) and noting that there must be uniformity within each zone throughout the district as a safeguard of the right to fair and equal treatment of landowners by the local zoning authority).

■ We now turn to the Circuit Court's jurisdiction to review the challenges to Ordinance 25–01, which rezoned the

Anderson House property from O–2 to C–T through a comprehensive zoning map amendment. With respect to § 4.08(a), *Maryland Overpak* teaches that jurisdiction is not proper under that Section because comprehensive zonings do not qualify as "zoning actions" for purposes of obtaining judicial review. 395 Md. at 50, 909 A.2d at 255.

With respect to § 4.08(f), the answer to the jurisdictional question, were there a need to confront and decide it here, is a bit more problematic. Rockville City Code § 25–100, purports to authorize an "appeal" to the Circuit Court by a person "aggrieved by a decision of the Council on any application for an amendment to the zoning map." The Circuit Court in the present case made clear, in dicta, however, that it had reservations concerning the applicability of this ordinance section, as well it should.

The Circuit Court was concerned with the proper interpretation of § 25–100 because the City Code refers, in a footnote, to Article 66B, § 4.08 as the source of the City's right to authorize an "appeal" of its decisions to the Circuit Court. Specifically, the Circuit Court was concerned that in reading the City Code *in pari materia* with Maryland Code, Article 66B, § 4.08, City Code § 25–100 could not authorize an "appeal" of a comprehensive rezoning action, one generally regarded as a purely legislative act, rather than one partaking of a quasi-judicial process. The court reasoned that because the City Code refers to § 4.08 it must be read in light of the Maryland Code. The court further reasoned that Rockville City Code, § 25–100, should be interpreted identically to Maryland Code, Article 66B, § 4.08 because of their similar language and purpose. Therefore, the court concluded, the Rockville City Code was limited to authorizing Circuit Court review of piecemeal zoning actions, but barred from allowing review of comprehensive zoning actions through the same modality.[17]

---

**17.** Indeed, there exist significant differences in process and character between a comprehensive zoning action and a piecemeal zoning action.

Comprehensive zoning is a purely legislative process, while piecemeal zoning is a quasi-judicial process, although each process concludes with a legislative act. "[A]bsent a confiscatory regulation or result, ... comprehensive rezoning[s] are limited only by the general boundaries of the appropriate procedural and due process considerations." *Rylyns*, 372 Md. at 533, 814 A.2d at 480 (quoting *White v. Spring*, 109 Md.App. 692, 696–97, 675 A.2d 1023, 1025 (1996)). Specifically,

> [t]he requirements which must be met for an act of zoning to qualify as proper comprehensive zoning are that the legislative act of zoning must: 1) cover a substantial area; 2) be the product of careful study and consideration; 3) control and direct the use of land and development according to present and planned future conditions, consistent with the public interest; and, 4) set forth and regulate all permitted land uses in all or substantially all of a given political subdivision, though it need not zone or rezone all of the land in the jurisdiction.

*Rylyns*, 372 Md. at 535, 814 A.2d at 481. Usually a legislative type public hearing is involved, without attendant imposition of even the relaxed administrative approach to evidentiary rules or the right of cross-examination. When the above requirements are met, the act of the legislative body, enjoys "a strong presumption of correctness and validity." *Id.* Thus, a reviewing court must ensure only that the adopting legislative body met appropriate procedural criteria and due process considerations in taking the comprehensive action, sought to achieve a valid public purpose, and was not in excess of the exercise of the police power. *Rylyns*, 372 Md. at 533, 814 A.2d at 480. The comprehensive zoning must bear "a substantial relationship to the public health, comfort, order, safety, convenience, morals and general welfare ... [The comprehensive zoning] enjoys a strong presumption of validity and correctness." *Norbeck Vill. Joint Venture v. Montgomery County Council*, 254 Md. 59, 65, 254 A.2d 700, 704 (1969) (internal citations omitted); *see also* discussion *infra* Part IIIC.

By contrast, a local zoning authority accomplishes a piecemeal zoning through a quasi-judicial process. *Rylyns*, 372 Md. at 532, 814 A.2d at 479. The hallmark of the quasi-judicial process is that "the act or decision is reached on individual, as opposed to general, grounds, and scrutinizes a single property." *Md. Overpak*, 395 Md. at 33, 909 A.2d at 245. In the quasi-judicial process, there must be "a deliberative fact-finding process with testimony and the weighing of evidence." *Id.* Usually some rules of evidence, albeit not as strict as those employed in a court trial, but including the right to cross-examine opposing witnesses, apply. *See generally* 395 Md. at 35–40, 909 A.2d at 246–49. Written findings of fact and conclusions of law explicating the reasons for the body's decision, expressed in terms of the statutory factors applying to the type of decision, are required. *Id.* The fact-finding process "usually entails at least the holding of a hearing, the receipt of factual and opinion testimony and forms of documentary evidence, and a particularized conclusion as to the development proposal for the parcel in question." *Md. Overpak* 395 at 38, 909 A.2d at 248. Judicial review of a piecemeal rezoning entails determining whether the fact-finding process has been properly pursued and whether the evidence of record supports the agency's decision. *Md. Overpak*, 395 Md. at 40, 909 A.2d at 249.

The court may not have reached the correct jurisdictional conclusion under the prevailing regulatory scheme in Rockville. While the Circuit Court focused on § 4.08(a)(1) in its analysis, it seemingly overlooked § 4.08(f), which states, "*[i]n addition* to the appeal provided in [§ 4.08(a)(1)], a local legislative body may allow an appeal to the circuit court of *any matter* arising under the planning and zoning laws of the local jurisdiction." (emphasis added).

The genesis of the State enabling legislation, Chapter 267 of the Laws of Maryland of 1975, entitled "An Act Concerning Planning and Zoning—Appeals," normally is the starting point for any analysis of this question. That Act was implemented

[f]or the purpose of clarifying the right of appeal of decisions of the Circuit Court or the Baltimore City Court in Zoning cases [and] to provide that counties, municipalities and the City of Baltimore may provide for an appeal to the Circuit Court or the Baltimore City Court of any matter arising under the planning and zoning laws of a county, municipality, or the City of Baltimore with certain limitations and that the decision of the Circuit Court or Baltimore City Court may be appealed to the Court of Special Appeals. . . .

Chapter 267 of the Acts of 1975, 1357–58

To do so, the Act made several changes. First, the Act repealed and reenacted § 4.08(a), "clarifying" the language therein by replacing the term "reclassification" with "zoning action." The Act companionably changed the language of Maryland Code, Article 66B, § 2.09(a), pertaining to "appeals" from "zoning actions" made by local legislative bodies in Baltimore City. Additionally, the Act created § 4.08(f), which provides that in addition to the "appeal" provided in § 4.08(a) a local legislative body may provide for an "appeal" of any matter arising under the planning and zoning laws of the County or municipal corporation. Pertinent to our discussion, provisions identical to § 4.08(f) were added at Maryland Code, Article 66B, § 2.09(f), governing zoning in Baltimore City, and Maryland Code, Article 25A, § 5(X), regarding zoning in

chartered counties in Maryland. In its 1975 Report to the General Assembly on Proposed Bills, the Legislative Council of Maryland discussed the purpose of the proposed Act, stating in pertinent part,

> [t]he proposed legislation clarifies the right of appeal, *and enables* local jurisdictions to provide for *other* appeals for noncharter counties, municipalities and the City of Baltimore by amending the appropriate provisions of Article 66B. The proposed legislation also empowers charter counties to provide for appeals in planning and zoning matters by amending Article 25A, Section 5(X). . . .

LEGISLATIVE COUNCIL OF MARYLAND, REPORT TO THE GENERAL ASSEMBLY OF 1975, PROPOSED BILLS 194 (emphasis added).

Our jurisprudence on the issue, though limited, demonstrates that § 4.08(f) is not necessarily constrained by our definition of the term "zoning action" for purposes of § 4.08(a). In *County Comm'rs of Carroll County v. Stephans,* 286 Md. 384, 408 A.2d 1017 (1979), our review of the term "zoning action" in § 4.08(a) and its twin, § 2.09(a), caused us to examine the legislative history set out above. In so doing, we noted that the history distinguishes the addition of § 4.08(f) from the change in language that replaced "reclassification" with "zoning action" in § 4.08(a). *Stephans,* 286 Md. at 392–96, 408 A.2d at 1021–23. We said there that the term "zoning action" does not embrace comprehensive zoning or rezoning. *Stephans,* 286 Md. at 397, 408 A.2d at 1023. We did not find, however, any limitation on the kinds of "appeals" in addition to those authorized by § 4.08(a) that a local jurisdiction might choose to authorize under the authority granted by § 4.08(f).

In *Hope v. Baltimore County,* 288 Md. 656, 421 A.2d 576 (1980), in interpreting § 4.08(f)'s twin statute for charter counties appearing at Maryland Code, Article 25A, § 5(X), we noted that the Section provides for the right of "appeal" to a circuit court of *any* matter arising under a chartered county's

planning and zoning laws.[18] Further, in *Gisriel v. Ocean City Board of Supervisors of Elections*, 345 Md. 477, 693 A.2d 757 (1997), we briefly discussed in dicta alternative pathways by which an "appeal" may be maintained. *Gisriel*, 345 Md. at 501 n. 16, 693 A.2d at 768 n. 16. There we noted the limitation that § 4.08(a) may not be used to "appeal" a comprehensive rezoning, but we said that "[e]ven if an appeal . . . was not authorized by § 4.08(a) . . ., it may have been authorized by § 4.08(f)" if the local jurisdiction provided for the "appeal." *Gisriel*, 345 Md. at 501 n. 16, 693 A.2d at 768 n. 16. Finally, in *Maryland Overpak*, we indicated that the delegation under § 4.08(f) is not constrained by our most recent interpretation of the term "zoning action" when we addressed § 2.09(a), the twin of § 4.08(a). *Md. Overpak*, 395 Md. at 52–53, 909 A.2d at 256–57. We stated that "the grant of authority in the 1975 law to the City Council to provide for appeal to the Baltimore City Court of any matter arising under the planning and zoning laws of the City of Baltimore, [under § 2.09(f), the twin of 4.08(f),] is not rendered mere surplusage by our broader reading of 'zoning action.' " *Id.*

Fortunately for all concerned, it is not critical to Anderson House's challenges to Ordinance 21–05 that this nascent jurisdictional query be decided finitely in this appeal. Because Anderson House filed a judicial review action and a declaratory judgment/injunctive action, which actions were consolidated for hearing and decision, jurisdiction to review Ordinance 21–05 existed in the Circuit Court to adjudicate its challenges in the consolidated action under at least one or the other of Maryland Code, Article 66B, § 4.08(f)/Rockville City Code, § 25–100 or the Declaratory Judgment Act. The parties do not

---

**18.** We note that the provision in § 5(X) is limited by the phrase, "except as provided in § 5(U)." Maryland Code, Article 25A, § 5(X). In *Hope*, we found that the broad delegation under § 5(X) was constrained because the County availed itself of the powers of § 5(U), creating a county board of appeals and giving it the power to hear the claim at issue. *Hope*, 288 Md. at 665–66, 421 A.2d at 581–82. Because the County adopted this alternative, a previously enacted statute providing an "appeal" directly to the Circuit Court became a nullity. *Id.* at 666, 421 A.2d at 582. There is no such constraint apparent on § 4.08(f).

dispute this result. Had Anderson House stuck to its original decision to file and pursue only a judicial review action, this jurisdictional question properly would have been teed up and would be ripe for decision in this matter. As it is, however, we shall leave resolution of that quandary to another day.

## III.

Despite its reservations concerning its jurisdiction, the Circuit Court proceeded to examine both Ordinances in light of Anderson House's arguments. Before us, as before the Circuit Court, Anderson House raises three arguments. The first two seek to invalidate the creation of the C–T zone generally. Anderson House argues that Ordinance 7–03, by countenancing varying minimum lot sizes, height restrictions, and floor area restrictions for each C–T zoned property, alternatively based on existing conditions at the time of imposition of the zone, violates the uniformity requirement of Maryland Code, Article 66B, § 4.02(b)(2). In the alternative, Anderson House argues that the C–T zone provisions violate the identicality requirement of Rockville City Code, §§ 25–1 and 25–91. Finally, Anderson House argues that the reclassification of its property to the C–T zone was an improper exercise of the City's police power under Maryland Code, Article 66B, § 4.01(b)(1). We shall affirm the Circuit Court's judgment. We hold that Ordinances 7–03 and 21–05 do not violate either the State uniformity requirement or Rockville's identicality requirement. We further hold that the City did not exercise improperly its delegated police power by placing the Anderson House property in the C–T zone.

## A.

According to Maryland Code, Article 66B, § 4.01, "[p]lanning and zoning controls shall be implemented by local government." Thus, Rockville, as a municipal corporation reached by Article 66B, has the power to zone by comprehensive regulation for the "orderly development and use of land and structures." Maryland Code, Article 66B, § 4.01(a)(1)(i). "To promote the health, safety, morals, or general welfare of

the community," the City of Rockville "may regulate and restrict . . . the height, number of stories, and size of buildings and other structures" and additionally may regulate lawn sizes and "the percentage of a lot that may be occupied." *Id.* § 4.01(b). There are, however, limitations on Rockville's power to zone; "[m]unicipalities wield only such zoning powers as are granted them by the Legislature." *Rylyns,* 372 Md. at 575 n. 31, 814 A.2d at 505 n. 31 (2002). Pertinent to this case, Maryland Code, Article 66B, § 4.02(b)(2) requires that "all regulations shall be uniform for each class or kind of development throughout each district. . . ." [19]

This requirement, commonly referred to as the "uniformity requirement" of Euclidean zoning, has its roots in the Standard State Zoning Enabling Act,[20] which states, at § 2, that applicable zoning "regulations shall be uniform for each class or kind of buildings throughout each district, but the regulations in one district may differ from those in other districts." 1 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING 3d § 5.25, at 417 (1986). This or a similar limitation appears in the state zoning enabling acts of nearly every state. *Id.* Indeed, Maryland employed the language verbatim, with the exception of the substitution of the word "development" for the word "building." Maryland Code, Article 66B, § 4.02(b)(2). The apparent motive for including the uniformity requirement in the early days of the introduction of zoning controls was appeasement of potentially hostile landowners. 1 ANDERSON *supra,* at 418. With the requirement, property owners were assured that similarly situated properties would

---

**19.** Note that "regulations in one district may differ from those in other districts." Maryland Code, Article 66B, § 4.02(b)(2).

**20.** This act was written during the 1920s by "the distinguished original group of planning lawyers in this country[,]" Edward Bassett, Frank Williams, and Alfred Bettman with the advocacy of Herbert Hoover's Department of Commerce. NORMAN WILLIAMS, JR & JOHN M. TAYLOR, AM LAND PLANNING LAW· LAND USE AND THE POLICE POWER § 18.01, at 461 (3rd ed. 2003). It is considered an important act concerning land use and controls, because it deals with many of the basics of zoning and planning. *Id.* As a result, many states have used it as a model for their zoning statutes. *Id.*

be subject to similar regulation. *Id.* In other words, the uniformity requirement springs less from pure legal necessity, but more from a policy desire to give notice to property owners that ad hoc zoning discriminations will not be tolerated by the law. *Id.* (citing EDWARD M. BASSETT, ZONING: THE LAWS, ADMINISTRATION, AND COURT DECISIONS DURING THE FIRST TWENTY YEARS 50 (1940)).

It has been observed that courts appear to have been somewhat reluctant to elaborate on or supply judicial gloss to the meaning of the uniformity requirement, perhaps due to the original policy purpose for its inclusion. 1 ANDERSON *supra,* at 288. Trends as to its application, however, appear in a number of states. Many jurisdictions agree that the kind of discrimination violative of the uniformity requirement occurs when a zoning ordinance singles out a property or properties for different treatment than others similarly situated. At the same time, those jurisdictions tend to find no violation of the uniformity requirement when zoning regulations are equally applicable, although their application produces varying restrictions and results across properties in the same zoning category. Decisions from New Jersey and Connecticut provide a useful "side by side" illustration of the application of the uniformity requirement.

In New Jersey, a violation of the uniformity requirement occurred when an ordinance imposed a setback requirement of 25 feet throughout a business district classification, with the exception of one block where a 67–foot setback was instead required. *N.T. Hegeman Co. v. Mayor and Council of Borough of River Edge,* 6 N.J.Super. 495, 69 A.2d 767 (Law Div.1949). On the other hand, an ordinance that used a mathematical formula to determine minimum lot sizes and maximum lot coverage based upon the steepness of slopes on properties did not violate the uniformity requirement even though it created varying results based upon a parcel's unique physical conditions or characteristics. *Rumson Estates, Inc. v. Mayor & Council of Borough of Fair Haven,* 177 N.J. 338, 828 A.2d 317 (2003). The New Jersey court emphasized that uniformly applicable regulations could result in different con-

ditions without violating the requirement. *Rumson Estates,* 828 A.2d at 329–30. The crux of the requirement is only that similarly situated properties are treated the same under the zoning regulations. *Id.; see also Quinton v. Edison Park Dev. Corp.,* 59 N.J. 571, 285 A.2d 5 (1971) (finding that an ordinance requiring a buffer strip for certain properties based upon size and location within the zone did not violate the uniformity requirement because all similarly situated properties were treated the same.); *State v. Gallop Bldg.,* 103 N.J.Super. 367, 247 A.2d 350 (App.Div.1968) (finding no violation of uniformity requirement for a special buffer provision where all properties similarly situated were subject to the same requirements).

Connecticut similarly recognized this distinction. An ordinance requiring a buffer strip for one specific land plot, while failing to compel the requirement in all other similar instances within the zone, was found discriminatory and in violation of uniformity. *Veseskis v. Bristol Zoning Comm'n,* 168 Conn. 358, 362 A.2d 538 (1975). On the other hand, an amendment to a town zoning regulation creating different minimum lot sizes, dependent upon various factors otherwise applicable across the zone, such as lot slope, and whether, and how much, of a property is covered by wetlands or watercourses, did not violate Connecticut's uniformity requirement. *Harris v. Zoning Comm'n of Town of New Milford,* 259 Conn. 402, 788 A.2d 1239 (2002). In distinguishing *Veseskis,* the *Harris* Court noted that the regulation in *Veseskis* affected only one specific parcel of land, whereas in *Harris* the amendment to the regulation was generally applicable. *Harris,* 788 A.2d at 1258. The court noted that the "thrust of the statutory requirement of uniformity is equal treatment" and concluded that "the fact that the amendment has [a] differing effect on parcels of land throughout the town does not render its application inconsistent or unequal" because it is applied to "every parcel within its purview consistently and equally." [21] *Id.*

---

21. Other jurisdictions follow the trend. When individual parcels are singled out for different treatment by the text of a zoning regulation, a

Maryland's common law conforms to the trend. Our discussion in *Rylyns* demonstrates a recognition and understanding of the origins and history of the uniformity requirement. We said there that

the requirement that there be uniformity within each zone throughout the district is an important safeguard of the right to fair and equal treatment of the landowners at the hands of the local zoning authority. Frankly put, the requirement of uniformity serves to protect the landowner from favoritism towards certain landowners within a zone by the grant of less onerous restrictions than are applied to others within the same zone elsewhere in the district, and also serves to prevent the use of zoning as a form of leverage by the local government seeking land concession, transfers, or other consideration in return for more favorable zoning treatment.

372 Md. at 536, 814 A.2d at 482.

Indeed, Maryland recognizes that the uniformity requirement is an important tool for the achievement of stability in land use and planning as effected through Euclidean zoning,

---

violation of the uniformity requirement results. *See, e.g., Matter of Augenblick,* 66 N.Y.2d 775, 497 N.Y.S.2d 363, 488 N.E.2d 109 (1985) (finding that the uniformity requirement was violated by a zoning ordinance that singled out one property to permit a use forbidden for all other parcels in the district); *Decker v. Coleman,* 6 N.C.App. 102, 169 S.E.2d 487 (1969) (finding that a requirement that one property maintain a buffer while all other lands similarly classified were not subject to such restrictions violated the uniformity requirement); *Boerschinger v. Elkay Enter., Inc.,* 32 Wis.2d 168, 145 N.W.2d 108 (1966) (finding an amendment permitting a use on only one of four similarly situated parcels in a district violated the uniformity requirement). When zoning restrictions apply uniformly across a district, but create varying requirements for properties, courts tend not to find a violation of the uniformity requirement. *See, e.g., Green Point Sav. Bank v. Bd. of Zoning Appeals of Town of Hempstead,* 281 N.Y. 534, 24 N.E.2d 319 (1939) (finding no lack of uniformity where ordinance resulted in more onerous requirements for certain uses in a zone because the ordinance uniformly applied in the zone); *Charter Township of Oshtemo v. Central Adver. Co.,* 125 Mich.App. 538, 336 N.W.2d 823 (1983) (finding no violation of the uniformity requirement where ordinance permitted reasonable restrictions based upon different conditions within the zone).

but also recognizes that "[p]erfect uniformity in zoning . . . is a baseless dream." *Rylyns,* 372 Md. at 534, 814 A.2d at 481; *Mayor and City Council of Balt. v. Byrd,* 191 Md. 632, 642, 62 A.2d 588, 593 (1948). As with other states, Maryland's limited case law on the uniformity requirement demonstrates that it is discrimination in favor of, or against, particular properties that will not be tolerated. In contrast, uniformly applicable regulations that produce disparate results in application do not violate the uniformity requirement.

For example, in *Board of County Commissioners of Washington County v. H. Manny Holtz, Inc.,* 65 Md.App. 574, 501 A.2d 489, the Court of Special Appeals found a violation of the uniformity requirement where a particular property was limited to half of the uses ordinarily allowed in the zone. Specifically, the Holtz property was rezoned from residential to business. *H. Manny Holtz,* 65 Md.App. at 576–77, 501 A.2d at 490. In the course of the rezoning, to appease certain protesters, the Holtz property was limited in the uses that could be established on it. *H. Manny Holtz,* 65 Md.App. at 577, 501 A.2d at 490. Thus, although the Board of County Commissioners had predetermined legislatively acceptable uses for the business zone by its enactment of a list of permitted uses, it sought to limit in a piecemeal fashion the Holtz property to only some of those uses. *H. Manny Holtz,* 65 Md.App. at 583, 501 A.2d at 493. Thus, the property at issue was singled-out and treated differently by the terms of the act of reclassification. The court aptly found that such a limitation would create a "mini-district" within the relevant business zoning district. The court said, "[i]f we were to authorize the Board of County Commissioners through rezoning to limit or restrict permitted uses of certain tracts within a zone, it would have the power to destroy the uniformity of the district"—to "emasculate" the requirement. *H. Manny Holtz,* 65 Md.App. at 583, 501 A.2d at 493; *see also Cassel v. Mayor and City Council of Balt.,* 195 Md. 348, 354, 73 A.2d 486, 488 (1950) ("The regulations for the use of property within the various use districts are supported upon the basic theory that they apply equally and uniformly.... Invidious distinctions and

discriminations in zoning cannot be allowed. . . ."); *Heath v. Mayor and City Council of Balt.*, 187 Md. 296, 305, 49 A.2d 799, 804 (1946) ("[E]quality and uniformity of operation within a particular zone as to each type of building are basic in the statute. Invidious distinctions and discriminations are not permissible.").

In contrast, in *Montgomery County v. Woodward & Lothrop*, 280 Md. 686, 718–23, 376 A.2d 483, 501–03 (1977), this Court found that no violation of the uniformity requirement occurred when properties within a zoning district were subjected to uniformly applicable regulations that created in application disparate results for individual properties. Specifically at issue were uniformly applicable regulations concerning gross floor area that created disparate results alleged to be in violation of the uniformity requirement. *Id.* Additionally, buildings for which permits were obtained before 1959 were subject to different treatment than buildings for which permits were obtained after 1959 relative to the immediacy with which they were required to conform to the new zoning code.[22] *Id.* We said there, that "[t]he focus [of the uniformity requirement] is upon the terminology of the ordinance, rather than upon its application." *Woodward & Lothrop*, 280 Md. at 720, 376 A.2d at 501. We found no violation of the uniformity requirement. *Woodward & Lothrop*, 280 Md. at 722–23, 376 A.2d at 502–03. Instead, we noted that the regulations applied uniformly, but with different results for properties based upon their characteristics. *Id.* In other words, regulations concerning a zoning district that are uniformly applicable may result in application in varying restrictions for individual properties without violating the uniformity requirement. "This difference in treatment is neither arbitrary nor invidiously

---

22. The Council provided that buildings, structures, or uses permitted prior to 1959 that became nonconforming upon reclassification to the new zone would not be subject to certain provisions of zoning ordinances for a period of seven years, while buildings permitted as of 1959 did not benefit from the grace period. *Woodward & Lothrop*, 280 Md. at 722–23, 376 A.2d at 503.

discriminatory, but affects alike all properties similarly situated." [23] *Woodward & Lothrop,* 280 Md. at 723, 376 A.2d at 503.

The Circuit Court in the present case was correct to find no merit in Anderson House's complaints as to Article 66B's uniformity requirement. Ordinance 7–03 calls for uniformly applicable regulations throughout the C–T zoning district. The minimum lot area for all developments is 5,000 square feet or the existing condition, whichever is greater as of the time a property is placed within the zone. Rockville City Code § 25–311. Building heights for all developments in the zone cannot exceed the height of any structures existing at the time a property was placed in the zone. *Id.* § 25–315. Total floor area for all improvements cannot exceed 150 percent of an existing building as it existed on 1 January 2003. *Id.* § 25–315(b). For all properties, side and rear yard setbacks and lot width restrictions are the same as for a comparably sized lot zoned residential. *Id.* § 25–312. The City's approach in framing the C–T zone avoids the need for a race to obtain variances lest existing developed properties become nonconforming uses or structures.

---

**23.** We note that uniform formulae or methods of calculating site development standards often, in application, create disparate results from property to property. For example, were we to hold the provisions of the C–T zone in violation of the uniformity requirement, Anderson House's property would revert to O–2 zoning. As the City notes, "that classification provides that side and rear yard setbacks next to residential uses be equivalent to the height of the building, but no less than 25 feet." This formula is applicable to all buildings within a class (those "next to residential uses") but creates disparate results when calculating individual yard setbacks. *See also Harris v. Mayor and City Council of Balt.,* 35 Md.App. 572, 584, 371 A.2d 706, 712–13 (1977), where the Court of Special Appeals upheld an ordinance that used a formula to determine the number of allowable dwelling units within a zone with disparate results, finding that "[a] classification having some reasonable basis does not offend ... merely because it is not made with mathematical nicety or because in practice it results in some inequality." In that case, the analysis concerned an alleged violation of the federal Equal Protection clause. Nevertheless, its reasoning is appropriate here on the point that zoning regulations need to be equally applicable, but *do not* need to result in cookie-cutter outcomes for every property within the particular zone.

The Anderson House property is but one property to which the uniform regulations applied and for which the uniform regulations created a unique result. It was not, according to this record, a property singled out by the terms of the legislation for disparate treatment. All properties included within the C–T zone are limited by the terms of the legislation. Although the Anderson House property may have been the largest property in gross lot size zoned C–T within the City, this does not make it a "mini-district," as in *Manny Holtz*, 65 Md.App. at 583–84, 501 A.2d at 493. Thus, on the record before us, we conclude that there was no unfair or unequal treatment, no arbitrary or invidious distinction or discrimination, and, indeed, no emasculation of the uniformity requirement. *Rylyns*, 372 Md. at 536, 814 A.2d at 481–82; *Manny Holtz*, 65 Md.App. at 583–84, 501 A.2d at 493; *Cassel*, 195 Md. at 354, 73 A.2d at 488; *Heath*, 187 Md. at 305, 49 A.2d at 804.

## B.

■ Anderson House also asserts that the C–T zone restrictions and placement of its property within the C–T zone violate Rockville City Code § 25–91(a), where it is required that amendments to the zoning map or to the Rockville City Code, Chapter 25, Zoning and Planning, must be adopted in compliance with procedures set forth in the Article and any other applicable law. Anderson House argues that this means that any amendment must comport with § 25–1 of the Rockville City Code. Section 25–1 generally provides Articlewide definitions and states, "[t]he following words, terms, and phrases, when used in this chapter, shall have the meanings ascribed to them in this section." Rockville City Code, § 25–1. Anderson House argues that this section creates an "identicality requirement" when amendments are made concerning zoning because it defines the term "zone" as

an area within which certain uses of land and buildings are permitted and certain others are permitted only by special exception or are prohibited; yards and other open spaces are required; lot areas, building height limits, and other

requirements are established; *all of the foregoing being identical* for the zone in which they apply.[24]

*Id.* (emphasis added).

According to Anderson House, the identicality requirement found in § 25–1 is stricter than the uniformity requirement of Article 66B, § 4.02(b)(2) of the Maryland Code. Anderson House argues that the C–T regulations are not identical because the formulae that generally apply, because of their alternative reliance on existing site and structure conditions, results in different zoning conditions for each C–T property. Focusing on the minimum lot size, Anderson House's argument goes: "[t]he offending ordinance establishes for the [C–T zone] a minimum lot size of '5,000 square feet or existing condition, whichever is greater.' Since the 'existing condition' is different for each and every property in the zone, the lot area restrictions for the C–T zone are not identical."

We find this argument unconvincing. Anderson House, by the terms of its argument, acknowledges that "identical" and "uniform" are synonymous. In both arguments, Appellant focuses on the disparate results achieved by application of the regulations while ignoring their uniform (or identical) application. Under Anderson House's "plain meaning reading" of the regulation, the identicality requirement of § 25–1 means that, in each Euclidean zone in the City of Rockville, every yard and other open space requirement, lot area, or building height requirement must yield a uniform result for every property. Anderson House misconstrues the regulation. Regulations "must be construed in a reasonable way." *Dep't of Pub. Safety & Corr. Servs. v. Donahue*, 400 Md. 510, 531, 929 A.2d 512, 525 (2007) (citing *Stoddard v. State*, 395 Md. 653, 663, 911 A.2d 1245, 1250 (2006)). In construing a regulation, we must avoid a construction "that is unreasonable, illogical, or inconsistent with common sense." *Stoddard*, 395 Md. at 663, 911 A.2d at 1250. A reading of the

---

24. Interestingly, Rockville's latest Draft Zoning Ordinance, available at http://www.rockvillemd.gov/zoning, does not include an identicality requirement in its definition of "zone."

regulation as Anderson House seeks would surely, however, create an absurd result. As noted by the Circuit Court, were we to rule in such a way, not only would the C–T zone's regulatory scheme be invalidated, we also would "pull the thread and unravel the sweater" of Rockville's zoning regulations as to all of its Euclidean zones and perhaps beyond.

▪▪▪ In employing properly the plain meaning rule, we search for a "definite and sensible meaning." *In re Arnold M.*, 298 Md. 515, 521, 471 A.2d 313, 315 (1984). Such a reading of the statute in this case leads us to conclude that regulations must be applied identically to each property within the zone, but need not produce a uniform result for every property in the zone. As noted by the Circuit Court, the C–T zone regulations (and other regulations created by the City) harmonize with such a reading. Indeed, as aptly put by the Circuit Court, "the C–T zoning scheme applies an identical regulatory scheme to each individual development within the C–T zone. Though, it is true the identically applied regulation produces unique results. Unique results do not themselves violate [the] Rockville City Code, § 25–1." Thus we hold, as did the Circuit Court, that the C–T zone's provisions do not violate the so-called "identicality" requirement embedded in the definition of "zone" in § 25–1 of the Rockville City Code.

## C.

Finally, Anderson House strives to convince us that placement of its property within the C–T zone exceeded the City's powers under Maryland Code, Article 66B, § 4.01(b)(1). According to § 4.01(b)(1), lot size, building height, floor area restrictions, yard and open space sizes, number of stories, and other restrictions must promote the health, safety, morals, or general welfare of the community. Maryland Code, Article 66B, § 4.01(b)(1).

Because the Anderson House property was rezoned as part of a comprehensive rezoning, that rezoning must "bear[ ] a substantial relationship to the public health, comfort, order, safety, convenience, morals, and general welfare." *Norbeck*

*Vill. Joint Venture v. Montgomery County Council,* 254 Md. 59, 65, 254 A.2d 700, 705 (1969). Judge Liss of the Court of Special Appeals summarized well the case law on review of comprehensive rezoning when he wrote for the court panel in *Stump v. Grand Lodge of Ancient, Free and Accepted Masons of Maryland,* 45 Md.App. 263, 269, 412 A.2d 1305, 1308 (1980):

> Zoning decisions which are made during a comprehensive rezoning process are strongly presumed to be correct. The reason for this strong presumption is that when engaged in comprehensive rezoning, the [zoning authority] is not considering individual properties on an isolated or piecemeal basis, but rather, it is considering the overall needs and development of the County [or City] as a whole.

> Comprehensive rezoning is a vital legislative function, and in making zoning decisions during the comprehensive rezoning process, a [zoning authority] is exercising what has been described as its 'plenary' legislative power. The power is broad and is limited only by the constitutional restriction that the [zoning authority's] action 'bears a substantial relationship to the public health, comfort, order, safety, convenience, morals and general welfare....'

*Id.* (internal citations omitted); *see Howard County, Md. v. Dorsey,* 292 Md. 351, 355, 438 A.2d 1339, 1342 (1982) (recognizing that "there is a strong presumption of the correctness of original zoning and of comprehensive rezoning, and that 'strong evidence' of error is required to overcome that presumption"); *Heller v. Prince George's County,* 264 Md. 410, 412, 286 A.2d 772, 774 (1972) ("We have said quite often that there is a strong presumption of the correctness of original zoning and comprehensive rezoning...."); *Norbeck Vill. Joint Venture,* 254 Md. at 66, 254 A.2d at 705 (1969) ("The broad test of the validity of a comprehensive rezoning is whether it bears a substantial relationship to the public health, comfort, order, safety, convenience, morals and general welfare, and such zoning enjoys a strong presumption of validity and correctness."); *McBee v. Balt. County,* 221 Md. 312, 316–17, 157 A.2d 258, 260 (1960) (noting that because a comprehensive

rezoning "cover[s] a substantial area, . . . it is entitled to the same presumption that it is correct as is an original zoning.")

Based upon this strong presumption, "the question for the reviewing court is merely to decide whether the board's action was arbitrary, capricious, discriminatory, or illegal, not to disturb a finding that is fairly debatable." *Muhly v. County Council for Montgomery County*, 218 Md. 543, 546, 147 A.2d 735, 737 (1959). Indisputably, Anderson House carries the heavy burden of establishing, by clear and affirmative evidence, that Ordinance 21–05 is invalid. *Edgewood Nursing Home v. Maxwell*, 282 Md. 422, 427, 384 A.2d 748, 751 (1978). Even where reasonable doubt exists, the Ordinance must be sustained. *Id.* "In other words, the legislature is presumed to have acted within [its police powers] so that if any state of facts reasonably can be conceived that would sustain [the Ordinance], the existence of that state of facts as a basis for the passage of the [regulation] must be assumed." [25] *Id.*

---

**25.** A pending proposal before the Mayor and Council, initiated at their request, yet could moot any favorable result in the present case sought by Anderson House. As the City notes in its brief:

In June, 2005, the City began the process of comprehensively revising the entire City Zoning Ordinance and in February, 2006, appointed a committee consisting of elected, appointed, and citizen representatives (known as "RORZOR") to draft a new zoning ordinance for consideration by the Mayor and Council. The Mayor and Council imposed a moratorium on various development activities in the City while the zoning revision process occurs. It is anticipated that RORZOR will release its draft in October 2007 which will result in the filing of a text amendment and related comprehensive map amendment. In its current form the RORZOR draft Zoning Ordinance eliminates existing non-residential zones, including the C–T zone, and substitutes new zones in their place. Most of these new zones are mixed-use zones that emphasize principles of form-based zoning. None of the Proposed new zones contain the development standards challenged here by appellant.

When questioned by the Court at oral argument in the present case whether the new regulations would moot this case, counsel for Anderson House jokingly commented that it could depend upon the local elections, which were occurring the same day. As it turns out, three out of five persons comprising the then incumbent Mayor and Council prevailed in the municipal election and continue to hold their positions.

 Anderson House, relying on case law from California and Pennsylvania, argues that the minimum lot size, building height, and floor area restrictions of the C–T zone as applied are irrational because they create an "island" of a large, restricted property (the Anderson House property) among much smaller surrounding properties also zoned C–T.[26] Anderson House complains that it is subject to special and unique restrictions because it is "simply not compatible in size with the other properties in the zone." [27]

---

**26.** Specifically, Anderson House cites three cases, *Hamer v. Town of Ross*, 59 Cal.2d 776, 31 Cal.Rptr. 335, 382 P.2d 375 (1963), *C & M Developers, Inc. v. Bedminster Twp.*, 573 Pa. 2, 820 A.2d 143 (2002), and *Nat'l Land and Inv. Co. v. Kohn*, 419 Pa. 504, 215 A.2d 597 (1965). We find these cases distinguishable and therefore unpersuasive.

In *Hamer*, the California Supreme Court found a one-acre minimum lot size restriction invalid where it was conceded by the parties that the restriction bore no relationship to the public health, safety, or general welfare. 31 Cal.Rptr. 335, 382 P.2d at 379–80. Rockville made no such concession here.

*C & M Developers* and *Kohn* similarly lack persuasive force. In *C & M Developers*, the Pennsylvania Supreme Court rejected a minimum lot size requirement, which it found to be motivated by a concern to preserve the character of a small number of residential homes, as exclusionary in purpose and therefore not in the interest of the public welfare. 820 A.2d at 158. In *Kohn*, the Pennsylvania Supreme Court rejected an argument that the public welfare was protected by a minimum lot size requirement which it found was intended to protect the setting for some older homes in the township. 215 A.2d at 611–12. These cases do not change our view of Ordinances 7–03 and 21–05 because we find that the City advanced facially valid justifications for the Ordinances, which included minimizing the impact of businesses on adjacent residential properties and preserving the residential character of the existing structures and lots. Indeed, the Maryland General Assembly has mandated that:

> [o]n the zoning or rezoning of any land under [Article 66B], a local legislative body may impose ... conditions ... that the local legislative body considers appropriate to preserve, improve, or protect the general character and design of the lands and improvements being zoned or rezoned; or the surrounding or adjacent lands and improvements.

Maryland Code, Article 66B, § 4.01(c)(1); *see also Rylyns*, 372 Md. at 568, 814 A.2d at 501.

**27.** We note that the twenty-two properties zoned C–T by Ordinances 23–03 and 21–05 vary widely in size. Nine properties in the zone are less than 10,000 square feet. Ten properties range from 10,000 to 20,000 square feet. Two properties range from 20,000 to 30,000 square

We find this argument unpersuasive. As previously noted, we have here uniform provisions that create in application disparate results from property-to-property. We reiterate:

> [T]he requirement that restrictions within a zone apply uniformly to all of the properties within that zone throughout the district serves to protect land owners from arbitrary use of zoning powers by zoning authorities. . . . [I]t is for this reason that the motives or wisdom of the legislative body in adopting an original or comprehensive zoning enjoy a strong presumption of correctness or validity.

*Rylyns,* 372 Md. at 538, 814 A.2d at 483 (citing *Norbeck Vill.,* 254 Md. at 65–66, 254 A.2d at 704–05).

Although the Anderson House property may be the largest property in the City currently zoned C–T, the zone was created "to address residences adapted to office use and was designed to not only minimize the impact on adjacent residential property but to preserve the residential character of the neighborhood within the C–T Zone." These goals are met by confining developed properties zoned C–T to the existing lot area and height of structures, as well as 150 percent of the structure size as of 1 January 2003, and by confining the setback and other requirements to that of a comparable residential property. Indeed, the Anderson House structure is an historic residential structure, transformed from residential to office use. It is located adjacent to residential properties. It's character makes it a logical candidate for the transitional C–T zoning, moving from the core of the Rockville Town Center, to surrounding C–T development, and then to residential uses.[28] Thus, it is indisputable that the City of

---

feet. Finally, one property falls within the range from 30,000 to 40,000 square feet, the Anderson House Property. It is not unreasonable to expect that one property will be the largest in size of any in the classification. If, by virtue of that distinction alone, its rezoning in a comprehensive rezoning becomes irrational, that would be a very silly rule of law.

28. It is inconsequential to our analysis here that Planning Staff and the Planning Commission supported split zoning the property C–T and O–2. This Court has recognized that the recommendations of a planning

Rockville's decision to do just that was a proper exercise of discretion within its zoning powers under Maryland Code, Article 66B, § 4.01(b).

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

body with respect to a comprehensive rezoning are not binding upon the legislative body. *Nottingham Vill. v. Balt. County,* 266 Md. 339, 345, 292 A.2d 680, 684 (1972); *Miller v. Abrahams,* 239 Md. 263, 272, 211 A.2d 309, 314 (1965).